In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-2257, 08-3979 & 08-4176

HYPERQUEST, INC.,

*Plaintiff-Appellant,*
*Cross-Appellee,*

*v.*

N'SITE SOLUTIONS, INC.,

*Defendant-Appellee,*

and

UNITRIN DIRECT INSURANCE COMPANY,

*Defendant-Appellee,*
*Cross-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 483—**Milton I. Shadur**, *Judge.*

ARGUED APRIL 20, 2010—DECIDED JANUARY 19, 2011

Before FLAUM, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* In 2001, Quivox Systems granted
N'Site Solutions, Inc. a non-exclusive license to certain
copyrighted software, called eDoc, that is used to process

insurance claims. Quivox later fell on hard times and sold its assets to Safelite Group, Inc., which continues to own the copyright for the eDoc software. Eventually, Safelite granted rights in the eDoc program to HyperQuest; when it did so, the parties acknowledged the continued existence of the N'Site license and they agreed that Safelite itself would retain certain rights to use and develop the software.

This case had its origins in a dispute between N'Site and HyperQuest over the terms of these licenses. To make matters worse, at least from HyperQuest's vantage point, N'Site sold the source code to its modified software to Unitrin Direct Insurance Company in 2006. HyperQuest filed suit on January 22, 2008, against both N'Site and Unitrin, asserting that each had infringed the copyrighted software. The district court concluded that HyperQuest held only a non-exclusive license and thus lacked statutory standing to sue; it therefore dismissed HyperQuest's case with prejudice. Later, the court awarded attorneys' fees and costs to N'Site and Unitrin in the amount of $134,958.42. HyperQuest has appealed, challenging both the conclusion that it was not an exclusive licensee (and thus not entitled to assert a claim for copyright infringement) and the attorneys' fee award. Unitrin cross-appealed from the district court's decision to reduce the amount of the fees it had requested. We conclude that the district court made no error either in interpreting the license or in its fee decisions, and we thus affirm its judgment.

**I**

We begin by taking a closer look at HyperQuest's interest in the copyright for eDoc. Initially, as we have already noted, Quivox, Safelite's predecessor in interest, granted a non-exclusive license for eDoc to N'Site. Under that agreement N'Site was entitled to use the software only within its own facilities; the license conferred no rights to modify the software or to sell it to others. Apparently after Safelite purchased Quivox's assets, it saw further opportunities for profit in eDoc. In the summer of 2004, Safelite entered into a licensing agreement with HyperQuest (then called HQ, but essentially the same company) for eDoc. The operative language appears in paragraph 2 of the agreement, which spells out the grant of the license and its scope. Subpart (a) says:

> Subject to all limitations and obligations set forth in this License Agreement, Safelite grants to HQ a perpetual (subject to termination only as provided in Section 4), worldwide, exclusive (except as set forth in Section 2(b)) license (i) to use the eDoc Software, in source code form, to support the development and commercialization of HQ Services, and (ii) to develop, modify and enhance the eDoc Software as HQ in its sole discretion determines; provided, that such modifications and enhancements are solely related to the development and commercialization of HQ Services. [The agreement then defines the term "use" and addresses sublicensing rights. This section then concludes:] Notwithstanding the foregoing, HQ may not, without the prior written consent of Safelite, which consent shall not be unrea-

sonably withheld, rent, sell, lease, transfer or sub-license the eDoc Software to any person or entity that competes with Safelite in the manufacture, distribution, or sale of automotive glass or related services, including but not limited to, those competitors set forth on Schedule 2(a).

Subpart (b) expressly addresses exclusivity. It says:

Except as otherwise provided in this Section 2(b), HQ's license to the eDoc Software is exclusive in the Territory. Such exclusivity shall terminate if a Sale of of [*sic*] HQ (as defined in the Master Agreement) occurs prior to July 5, 2009. Safelite shall have the right to use the eDoc Software and may license the eDoc Software to third parties solely for purposes of testing or development.

Further down, this subpart addresses the N'Site license:

Notwithstanding the foregoing, HQ acknowledges the eDoc Software is licensed ("License") to N'SITE Solutions, Inc. ("N'SITE"). HQ further acknowledges Safelite and N'SITE are presently negotiating the terms of a revised license ("Revised License") regarding N'SITE's use of the eDoc Software.

From there, the paragraph includes promises by Safelite to keep HQ apprised of the status of its negotiations with N'Site. It ends with the following promise: ". . . in the event the Revised License is modified to include terms substantially different than the Revised License provided to HQ, Safelite will advise and include HQ in the determination of the final terms of the Revised License." Finally, paragraph 3(a) of the agreement pro-

vides that "all right, title and interest in and to the eDoc Software (including, but not limited to, all Intellectual Property Rights) will remain the exclusive property of Safelite, and all right, title and interest in and to the HQ Modifications shall vest in Safelite upon creation."

In the end, Safelite and N'Site did not succeed in their efforts to renegotiate their agreement. Another part of the contract between Safelite and HQ required Safelite to notify N'Site by April 1, 2006, that Safelite was terminating the License or Revised License with N'Site. Before that date, however, N'Site had undertaken a number of steps that HyperQuest believed were unauthorized.

On June 9, 2003, Safelite notified N'Site that it had acquired the Quivox assets, including Quivox's interest in the eDoc copyright and the licensing agreement. In October 2003, Safelite notified N'Site that the latter had breached the licensing agreement because N'Site had failed to pay certain licensing fees to Safelite. That notification led to the negotiations in the spring of 2004 that are mentioned in the HyperQuest agreement. Shortly before those talks broke down, N'Site told Safelite that it was not using the eDoc software for any purpose, because the software was obsolete and inadequate.

HyperQuest also points to numerous other acts that N'Site took that (it says) were inconsistent either with the terms of N'Site's own license or with HyperQuest's understanding of its own license. Its list of grievances includes at least the following four: (1) N'Site installed the eDoc software at locations other than its own facility; (2) N'Site did not restrict its use of the eDoc

software to its immediate organization, its own use, or for the purpose of electronic collection, storage, and transfer of claims; (3) N'Site modified and created derivative works from the eDoc software; and (4) N'Site marketed and sold either the eDoc software itself or the derivative works to third parties. For example, HyperQuest says, N'Site sold the source code of its N'Solutions software to Unitrin in the summer of 2006 for more than $700,000. In 2007, N'Site released a new version of N'Solutions called ClaimHub, which it continues to market and sell. HyperQuest asserts that all of these products were derivative works based upon eDoc.

In November 2006, Safelite filed an application in the U.S. Copyright Office for registration of eDoc; it was promptly registered, and on January 7, 2008, HyperQuest recorded the Safelite/HQ License with the Copyright Office. As we noted, this lawsuit followed less than a month later.

## II

The Copyright Act restricts the set of people who are entitled to bring a civil action for infringement to those who qualify as "[t]he legal or beneficial owner of an exclusive right under a copyright . . . ." 17 U.S.C. § 501(b). Some courts (including this one in years past, see, *e.g.*, *Moran v. London Records, Ltd.*, 827 F.2d 180 (7th Cir. 1987)) have seen this as a limitation derived from Article III's standing requirement (which is discussed in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559-60 (1992), among other cases), but we believe that it is preferable

to be more precise in our language. Many parties who have not crossed the "T's" and dotted the "i's" in their copyright licenses would have no trouble demonstrating injury in fact, causation, and redressability—the three indispensable requirements for constitutional standing, *id.* at 560-61, but their efforts to sue will nonetheless be thwarted by the statutory requirement. Another possibility, closer to the mark, is that the Copyright Act establishes criteria for the real party in interest, as that term is used by Federal Rule of Civil Procedure 17(a). See generally 6 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 21:2 (2009). Or one could keep it simple and say that the Copyright Act spells out who has enforceable rights under the statute; someone who does may sue, and someone who does not has failed to state a claim upon which relief may be granted. Our understanding of the law as it now stands, particularly in light of the Supreme Court's decision in *Reed Elsevier, Inc. v. Muchnick,* 130 S. Ct. 1237, 1243-44 (2010), is that the last of these approaches is the correct one. In essence, it reflects the way that the district court approached this case. Had its dismissal of HyperQuest's suit really been on the basis of Article III standing, the dismissal would have been without prejudice. See, *e.g., In re African-American Slave Descendants Litigation*, 471 F.3d 754, 758 (7th Cir. 2006). Instead, the court correctly realized that its ruling was one with prejudice—in other words, the kind of ruling one would expect in response to a motion under Federal Rule of Civil Procedure 12(b)(6).

The central question in HyperQuest's appeal is thus whether Safelite conveyed enough rights to it to make it "[t]he legal or beneficial owner of an exclusive right"

under the Copyright Act. Importantly, HyperQuest does not have the burden of showing that it is the owner of *all* exclusive rights; even one will suffice. The Act entitles a copyright's owner to a bundle of six different exclusive rights:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106. The three rights that are at issue in this case are the right to reproduce the copyrighted work (#1), the right to prepare derivative works based upon the copyrighted work (#2), and the right to distribute copies of the work to the public (#3). These rights are divisible,

meaning that the owner may convey each one of them to a different person. See 17 U.S.C. § 201(d)(2) ("Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified in section 106, may be transferred . . . and owned separately."). Thus, if the exclusive right to reproduce (meaning exclusive of the grantor as well as all third parties) were transferred to A, the exclusive right to prepare derivative works were given to B, and the exclusive right to distribute copies to the public were granted to C, each transferee would be entitled to sue for infringement of its particular right. The corollary to this rule is that a person holding a non-exclusive license is not entitled to complain about any alleged infringement of the copyright. See *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996); 17 U.S.C. § 101 (defining a "transfer of copyright ownership"); *id.* § 501(b) (providing that only the legal or beneficial owner of an exclusive right may institute an action).

HyperQuest's right to recover for N'Site's alleged infringement therefore hinges on its ability to prove that it was an exclusive licensee of at least one of the divisible rights recognized by the Act. Although Unitrin argues that HyperQuest never showed that it obtained the license from its predecessor in interest, HQ, we see no need to dwell on this point. The easy response is that Unitrin waited too long to raise the argument, since it introduced it only in its reply brief in the district court. *Cf. India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 659 n.2 (7th Cir. 2010). Even if we were inclined to forgive the forfeiture, we see nothing of sub-

stance here. HyperQuest specified in its complaint that it was formerly known as HQ. On appeal, it has provided corporate records confirming that all of HQ's contract rights passed to HyperQuest when HQ entered into a migratory merger that shifted its status from an Illinois to a Delaware corporation. That is more than enough. And we do find that Unitrin forfeited the new argument that it has tossed into the case for the first time on appeal, namely, that HyperQuest may have owned only the rights to eDoc and not to the separately copyrighted eDocexpress software. The license refers generally to the "software commonly referred to as eDoc." It appears that the parties drew no distinction between eDoc and eDocexpress, since the 2004 license agreement acknowledged that the eDoc software was licensed to N'Site, even though the 2001 Quivox/N'Site license spoke only of eDocexpress. These kinds of scorched-earth tactics are an unfortunate waste of everyone's time.

This part of the case turns entirely on the language of the 2004 license. We must read that agreement, however, as a whole. The fact that it uses the phrase "exclusive license" or its equivalent from time to time is something of which we take note, but it is not dispositive. It is the substance of the agreement, not the labels that it uses, that controls our analysis. See generally *In re Isbell Records, Inc.*, 586 F.3d 334, 337-38 (5th Cir. 2009) (stressing the importance of viewing the copyright agreement as a whole); *SCO Group, Inc. v. Novell, Inc.*, 578 F.3d 1201, 1209-10 (10th Cir. 2009) (applying California law and holding that agreements transferring copyrights must be read as a whole); *Kennedy v. National Juvenile Detention Ass'n*,

187 F.3d 690, 694 (7th Cir. 1999) (noting that normal rules of contract construction govern copyright agreements and applying principles of Wisconsin law, including the rule that every term of the agreement must be given meaning). We must decide whether HyperQuest can prove that it received one or more divisible rights, and if so, whether it is entitled to enforce them.

At first blush, it seems apparent that HyperQuest has never been the sole holder of any of the three exclusive rights that it has identified—reproduction, derivative works, or distribution. Under the 2004 agreement Safelite explicitly reserved a limited right to use the eDoc software and to distribute it to third parties for development. But, HyperQuest responds, each of the three rights it has identified can themselves be subdivided into smaller bundles of rights. Although one would reach the point of absurdity going too far down that line, it does not follow that *any* subdivision is too much. To the contrary, HyperQuest is correct to observe that subdivision is possible. See 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.02[A] (2009) [hereinafter "NIMMER"] ("[T]here would appear to be no limit on how narrow the scope of licensed rights may be and still constitute a 'transfer' of ownership, as long as the rights thus licensed are 'exclusive.'"). The typical example is that of the author of a novel who gives an exclusive license for the hardcover edition to one person and an exclusive license for the movie version to a second. See *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 886-87 (9th Cir. 2005) (noting that the legislative history of the Copyright Act supports allowing

parties to subdivide exclusive rights). But it appears that these subdivisions must be done cleanly, so that the limits of each holder's rights can be defined. See *Kepner-Tregoe, Inc. v. Vroom,* 186 F.3d 283, 287 (2d Cir. 1999). Perhaps for that reason, rights are usually subdivided along geographical lines or distinctions among forms of production. See generally NIMMER, *supra*, § 10.02[A].

It may be easiest, by comparing what rights other parties had in the software, to see if there is anything left over that HyperQuest held exclusively. Beginning with N'Site, we know that its interest in eDoc is defined solely by the 2001 Quivox/N'Site agreement. That agreement imposed a geographical limitation on N'Site: it could use the software only in its own facilities. It was not entitled otherwise to reproduce, distribute, or create any derivative works. Since HyperQuest has not asserted that any of N'Site's internal activities amounted to copyright infringement, that takes N'Site out of the picture. Putting the licensor itself to one side, the 2004 agreement gave HyperQuest the right to engage in the relevant activities in all settings not defined by the N'Site license.

Matters become more complicated when we look at the remainder of the 2004 Safelite/HyperQuest agreement. Safelite retained a significant package of rights, including the right (1) to use eDoc in a manner that did not compete directly with HyperQuest, and (2) to license eDoc software to third parties solely for testing and development. HyperQuest urges us to read the latter carve-out narrowly, so that it covers only Safelite's ability to add

modifications to fix bugs in the program. See 17 U.S.C. § 117; *Krause v. Titleserv, Inc.*, 402 F.3d 119, 125-29 (2d Cir. 2005). But we see nothing in the language of this agreement to signal that such a limited right was reserved. The use of the term "development" naturally suggests a more open-ended reservation—one looking to new generations of the software, or new applications, for example.

Our case is more complicated than the one the Second Circuit faced in *Kepner-Tregoe,* since that court was dealing with only two parties (licensor/owner and licensee), 186 F.3d at 285, while we have three parties (owner, licensee, third-party alleged infringer). If it is easy to distinguish between the owner's and the licensee's rights, then application of the divisibility rule is still relatively straightforward. For example, if the owner of a copyrighted novel retains the right to publish a conventionally printed book and grants a license to another to produce the novel in all forms (including conventional printing of a book), the license is exclusive with respect to every form except a printed book and it is non-exclusive as to the printed books. If a third-party published an infringing book, then the person entitled to enforce the copyright remains the owner, not the holder of the non-exclusive license. If a third-party publishes an e-book, however, then the licensee has the right to sue for infringement.

It is more difficult to trace exclusive rights when they are not restricted by geography or production form. In our case, HyperQuest received broad rights to reproduce,

distribute, and create derivative works, but Safelite retained a wide array of rights also. The most gaping hole in HyperQuest's license occurs in paragraph 2(b), quoted earlier. HyperQuest acknowledged that it took its license not only subject to the existing N'Site license (which as we have explained does not destroy very much of its exclusivity), but also subject to the open-ended new license that Safelite and N'Site were working on during the spring of 2004. HyperQuest retained no right to veto any terms that might have appeared in that license. All it got, essentially, was the right to a seat at the table if the eventual planned license deviated materially from the version that HyperQuest had already seen. Confirming that understanding is the language in paragraph 3(a) of the 2004 agreement that we quoted earlier, providing that "all right, title and interest in and to the eDoc Software (including, but not limited to, all Intellectual Property Rights) will remain the exclusive property of Safelite, and all right, title and interest in and to the HQ Modifications shall vest in Safelite upon creation." We understand that there are qualifications to this assertion, but when all is said and done, we cannot find in this license the kind of clearly delineated exclusivity over at least one strand of the bundle of rights that would permit HyperQuest to sue for infringement.

This conclusion is most consistent with the treatment of the rights that HyperQuest is emphasizing. With respect to derivative works, it appears that HyperQuest and Safelite have similar licensing authority. Safelite reserved the right to license any third-party for the pur-

poses of "testing or development," and HyperQuest also had the right to prepare derivative works on its own or to grant sublicenses for that purpose. With respect to the rights to reproduce and to distribute the eDoc software, HyperQuest runs into a different problem. Its only complaint in this case is that N'Site was engaging in both of these acts, but for the reasons we have already explained, the 2004 agreement is completely open-ended about the rights that Safelite was entitled to give to N'Site. All it had to do was to give HyperQuest a seat at the table—in the words of the agreement, "Safelite will *advise and include* HQ in the determination of the final terms of the Revised License." (Emphasis added.) HyperQuest has tried to stretch this into a requirement that it had to give Safelite its permission for any changes in the N'Site license, but we cannot bend the language of the agreement that far. The fact that hindsight reveals that Safelite did not exercise its right to confer greater rights on N'Site does not matter. We must determine the scope of HyperQuest's rights as of the time it received them. The agreement demonstrates that HyperQuest did not receive the degree of exclusivity in the realms of reproduction and distribution that it may have wanted.

It was HyperQuest's burden to show that the agreement conferred this type of exclusivity upon it. Viewed this way, the problem for HyperQuest is that the boundaries between its rights, those that Safelite retained, and those that N'Site was entitled to exercise, are blurry at best. HyperQuest argues that as long as it has the right to exclude a third-party defendant from using the

copyrighted software, then it holds the right to sue for infringement. But the right to exclude, standing alone, is not enough. Suppose that Amy, a copyright owner, licenses her copyright to Bill and promises Bill that she will not also give a license to Charlie. Under Hyper-Quest's theory, if Charlie now uses the copyright without authorization, Bill would be entitled to sue for infringement. But this seems contrary to the intent of the Copyright Act; Amy's promise of exclusivity extended only to Charlie—she gave Bill no right of exclusivity *vis-à-vis* Dave, Ellie, or Francesca. It therefore seems that Bill might have a contract action against Amy, but no more, if Amy is content to tolerate Charlie's infringement. HyperQuest resists this conclusion with a number of citations to patent cases, but they are not helpful in this regard, because patent licensees who do not have sole authority over the patent are permitted to sue only if they join the patent owner. See generally 35 U.S.C. § 281; *Waterman v. MacKenzie,* 138 U.S. 252, 255 (1891). HyperQuest did not join Safelite as a co-plaintiff, nor has it ever expressed any interest in doing so.

We hasten to add that we are not adopting the rigid position that N'Site and Unitrin have urged—namely, that a copyright owner's retention of ownership rights renders all subsequent licenses non-exclusive. Such a broad statement is inconsistent with the language in the Copyright Act that recognizes the divisibility of exclusive rights. It is also unnecessarily formalistic; just as the use of the word "exclusive" here and there in the license is not enough to resolve the question of the nature of HyperQuest's interest, the failure to use any

particular word is not dispositive. The decision whether Safelite, as the owner of the copyright, has conveyed clear exclusive rights to HyperQuest is one that can be made only after careful analysis of the agreement between the parties.

## III

We now turn to the court's decision to award attorneys' fees. HyperQuest attacks both the award of any fees at all and the amount of the fees that the court imposed. Unitrin, for its part, has filed a cross-appeal in which it complains that the district court cut the award down too far. Before addressing each of these arguments, we must address a jurisdictional issue that affects Unitrin's cross-appeal. (N'Site did not file a separate cross-appeal.)

The district court granted the defendants' motion to dismiss on May 1, 2008, and HyperQuest filed a timely notice of appeal on May 20, 2008. The district court then entered its order granting attorneys' fees to the defendants on November 3, 2008; final judgment on that matter was docketed on November 10, 2008. The court then amended its judgment on November 12, 2008, to clarify that the fee award ran in favor of both Unitrin and N'Site. HyperQuest filed another notice of appeal on November 19, 2008.

The complication arises with the timing of the cross-appeal. Unitrin waited to file its notice of appeal until December 12, 2008, more than 30 days after the

November 10 judgment. See FED. R. APP. P. 4(a)(3) (pro-
viding party with either 14 days after another party files
a notice of appeal to lodge its own notice, or the normal
30 days given by Rule 4(a)(1)(A)). Unitrin's notice is thus
timely only if the 30-day period for taking an appeal
began to run on November 12 rather than November 10.
But the court's entry of November 12 was not prompted
by a motion under Rule 59(e) by Unitrin or any other
party, nor did it respond to any of the other motions
that toll the period for filing a notice of appeal. See FED.
R. APP. P. 4(a)(4)(A). The later order appears to be an
effort to correct a mistake—though whether it can be
called "clerical" is doubtful. The November 10 judgment
stated that "final judgment is entered in the sum or [*sic*]
$134,958.42 in favor of Unitrin and against Hyperquest
for attorney's fees and expenses." The November 12
judgment said that "final judgment is entered in the
sum of $134,958.42 in favor of Unitrin and N'Site Solu-
tions, Inc., and against Hyperquest, Inc., for attorney's
fees and expenses."

Changing a fee award from one that runs solely in
favor of one party (Unitrin) to one that runs jointly and
severally in favor of two parties is not a clerical move.
It changes parties' legal entitlements. We thus do not
believe that Rule 60(a) provided the authority to make
this change; that rule can be used only to correct
clerical mistakes that subvert the court's intention with
respect to the original judgment. FED. R. CIV. P. 60(a);
*American Federation of Grain Millers, Local 24 v. Cargill
Inc.*, 15 F.3d 726, 728 (7th Cir. 1994). Rule 59(d), however,
permits the court to act on its own initiative to order a

new trial. FED. R. CIV. P. 59(d). It does not mention amending a judgment, but it seems only sensible, if the court has detected a problem within such a short period of time, to permit it to take that step. In our opinion, the November 12 judgment did effect "[a] significant change in a judgment," and thus it started all time periods anew. *Charles v. Daley*, 799 F.2d 343, 348 (7th Cir. 1986). Unitrin's notice of appeal was therefore filed in time and we can proceed to the merits.

The Copyright Act gives the district court discretionary authority to grant attorneys' fees in favor of the prevailing party. 17 U.S.C. § 505. See generally *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994). Following the Supreme Court's decision in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598 (2001), we have held that "a litigant 'prevails' (for the purpose of fee-shifting statutes) when it obtains a 'material alteration of the legal relationship of the parties.'" *Riviera Distributors, Inc. v. Jones*, 517 F.3d 926, 928 (7th Cir. 2008) (quoting *Buckhannon*, 532 U.S. at 604). Defendants who defeat a copyright infringement action are entitled to a strong presumption in favor of a grant of fees. *Mostly Memories, Inc. v. For Your Ease Only, Inc.*, 526 F.3d 1093, 1099 (7th Cir. 2008).

HyperQuest acknowledges that it is not easy to overturn an award of fees. It asserts, however, that the award is tainted by legal error: the district court, it says, applied an irrebuttable presumption in favor of granting fees to these defendants. Moreover, it adds, the district court's explanation of its decision fell far short of

the standards the Supreme Court imposed in *Fogerty*. See 510 U.S. at 535 n.19. It is referring to the following non-exclusive factors, all of which were highlighted as potentially helpful in guiding the district court's discretion: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance consideration of compensation and deterrence." *Id.* (internal quotation marks omitted).

Although the district court's explanation could have been more fulsome, HyperQuest has not shown that the court abused its discretion. We accept, as the district court apparently did too, that HyperQuest's suit was filed in good faith and had some merit. But this does not distinguish it from a great many copyright infringement cases. The district court was satisfied that the defendants were entitled to prevail and had done a good job of litigating the case.

This leaves the dispute about the amount of the fee award: HyperQuest says that it is too high, and Unitrin thinks it is too low. Both sides appear to concede that we are reviewing only for abuse of discretion. See *People Who Care v. Rockford Bd. of Educ., School Dist. No. 205*, 90 F.3d 1307, 1314 (7th Cir. 1996). Unitrin and N'Site asked for over $200,000 in fees, but the district court cut that amount to $134,958.42 (including costs). There was no dispute about the hourly rates that Unitrin's and N'Site's attorneys charged; the question instead was whether the number of hours the defendants submitted was reasonable. The district court used the hours spent by

HyperQuest as a benchmark and decided to award the defendants an amount equal to 150% of the fees that the plaintiff had paid. In explaining that decision, the court reminisced a bit about its own experience in the practice of law. Unitrin believes that it was the victim of "nebulous eyeballing," a practice this court criticized in *People Who Care*. See 90 F.3d at 1314 ("[T]he record ought to assure us that the district court did not 'eyeball' the fee request . . . .") (internal quotation marks omitted).

Although it would have been helpful if the court had offered a more detailed explanation, we conclude that it said enough. Though it did not dive into the minute details of the defendants' billing records, it used HyperQuest's records as a useful comparator in order to anchor its analysis. In doing so, it acknowledged that the defendants were entitled to recover substantially more fees than HyperQuest, since there were two of them and it would have been impossible for them to have coordinated perfectly. The court also took note of some of HyperQuest's challenges to particular entries on the ground that they reflected duplicative work and overbilling by high-level partners. The record is adequate to assure us that the district court did not reduce Unitrin's fee award arbitrarily. To the contrary, the district court's analysis provides adequate support for the final number the court chose, and we conclude that the award cannot be regarded as an abuse of discretion.

\* \* \*

In the final analysis, we conclude that HyperQuest did not have the kind of interest in the eDoc software

that it needed in order to be entitled to bring this suit for copyright infringement. The defendants—Unitrin and N'Site—were thus entitled to judgment in their favor. This in turn made them prevailing parties for purposes of attorneys' fees under section 505 of the Copyright Act. Finally, we find no reversible error in the fee award itself. We therefore AFFIRM the judgments of the district court.