*John Wiley & Sons, Inc. v. DRK Photo*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: February 1, 2016    Decided: February 16, 2018)

Docket No. 15-1134

JOHN WILEY & SONS, INC.,

*Plaintiff-Appellee,*

–v.–

DRK PHOTO,

*Defendant-Appellant.*

Before:

PARKER, CHIN, and CARNEY, *Circuit Judges.*

In this copyright case, DRK, a purported assignee of photographers' rights to sue for infringement, seeks statutory damages from Wiley, a licensee, for exceeding its licensed use of certain photographs as to which DRK non-exclusively represents the photographers. Invoking our precedent in *Eden Toys v. Florelee Undergarment, Co.*, 697 F.2d 27 (2d Cir. 1982), the District Court granted summary judgment to Wiley, concluding in part that DRK lacked statutory standing to sue Wiley for copyright infringement. Consistent with *Eden Toys*, we too conclude as a matter of law that the Copyright Act does not permit prosecution of infringement suits by assignees of the

bare right to sue that are not and have never been a legal or beneficial owner of an exclusive right under copyright. In addition, because we also conclude that DRK is not and has never been the holder of an exclusive right in the photographs, we AFFIRM the judgment of the District Court.

Judge Parker dissents in a separate opinion.

———————

ROBERT PENCHINA, Levine Sullivan Koch & Schulz, LLP, New York, NY, *for Plaintiff-Appellee*.

MAURICE HARMON, Harmon & Seidman, LLC, (Christopher Seidman and Gregory N. Albright, *on the brief*), Grand Junction, CO, *for Defendant-Appellant*.

———————

SUSAN L. CARNEY, *Circuit Judge*:

In this copyright case, DRK Photo ("DRK"), an Arizona sole proprietorship and a non-exclusive agent of numerous photographers, attempts to assert infringement claims against John Wiley & Sons, Inc. ("Wiley"), a licensee of the photographers' images, for exceeding the scope of its licenses. DRK's rights with respect to the infringement claims rest on agreements between it and the photographers. These purport to assign to DRK the right to sue on accrued causes of action. The parties dispute whether they also convey any exclusive right under a copyright. The District Court granted summary judgment for Wiley, concluding that DRK did not have statutory standing under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, to sue Wiley for infringement. On appeal, the primary question presented is whether the Act permits DRK, as a putative assignee of the bare right to sue for infringement, and who neither has, nor has ever had, an exclusive right under copyright in any of these photographs, may pursue an infringement claim against Wiley. Like the District Court, we conclude that it may not.

The text of the statute directs this result. In relevant part, the Act provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right while he or she is the owner of it." 17 U.S.C. § 501(b). An assignee of the bare right to sue who does not hold, and has never held, an exclusive right under a copyright, is not such an owner. The statute nowhere provides that such an assignee may sue, and we think, in view of its designation of who *may* sue, that the omission signals that Congress did not so intend.

Supplementing that reading, the District Court here (Failla, *J.*) interpreted our 1982 decision in *Eden Toys, Inc. v. Florelee Undergarment, Co.*, 697 F.2d 27 (2d Cir. 1982), as requiring that any conveyance of the right to sue for infringement carry with it also an exclusive right under the copyright if it is to be effective as a basis for an infringement suit. *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 280 (S.D.N.Y. 2014). We think the import of our decision in *Eden Toys* may not be quite so conclusive on this score as the District Court understood, but if not necessarily controlling, it is at least strongly supportive of our textual reading here.

Because we also concur with the District Court that the agreements between DRK and the photographers that it represented as a non-exclusive agent do not convey such an exclusive right, nor did DRK hold such a right when Wiley is alleged to have committed the infringing acts, we AFFIRM that court's entry of summary judgment in Wiley's favor.

**BACKGROUND**

The factual background of this case is largely undisputed.[1]

---

[1] As an evidentiary matter, the parties debate whether certain material extraneous to the operative agreements may appropriately be considered in conjunction with them. We refer to

3

DRK Photo is operated by Daniel Krasemann. It maintains a collection of stock photographs available for licensing, for a fee, by various users, including textbook publishers such as John Wiley & Son. Wiley, based in New York, is a global company that focuses on publishing educational materials for undergraduate and graduate students.

The parties' relationship began in 1992, when DRK first licensed Wiley to reproduce certain images for use in its educational materials. A typical DRK license granted to Wiley a one-time, non-exclusive right to use specified images not to exceed a certain number of copies, usually numbering in the tens of thousands. The cost to Wiley of a license typically ranged from approximately $80 to $500. DRK appears to have been generally open to amending a license after issuance to cover uses in larger production runs than originally authorized.

DRK does not directly employ photographers. Instead, it enters into "Representation Agreements" in which photographers grant to DRK, for a share of the licensing proceeds, the rights to include images in its collection and to license those images to third parties for a fee. The Representation Agreements relevant here establish non-exclusive agency relationships, in that they allow the photographers to enter into similar arrangements with other agents as well. In relevant part, the DRK non-exclusive license typically provides, "I desire that you [DRK] act as my agent with respect to the sale or leasing of the photographs or transparencies which I have delivered to you and shall deliver to you in the future." J.A. 294. DRK executed most of the Representation Agreements of concern here in the 1980s and '90s.

and identify that evidence in our narrative, below, and address the evidentiary challenge separately.

4

In 2008, DRK undertook what it called a "copyright registration program." J.A. 205. As part of the program, DRK asked its photographers to execute a single-page document entitled "Copyright Assignment, Registration, and Accrued Causes of Action Agreement" (the "Assignment Agreement"). *Id*. at 205; *see also, e.g., id. at* 411. DRK explained in contemporaneous correspondence with the photographers that the Assignment Agreements were "necessary as DRK Photo is initiating a copyright registration program with the United States Copyright Office to officially register many of the images in its collection." *Id*. at 205. DRK further explained that, "with a Certificate of Registration in hand (prior to a copyright infringement) we will be in a much stronger position with much more leverage for settling copyright infringement claims." *Id*. at 205. "[W]ith this Agreement," it advised, "we receive the authorization necessary to initiate and settle copyright infringement claims brought against would be infringers of DRK Photo Images." *Id*. at 205.[2]

The Assignment Agreements contain two pertinent provisions. The first, the "Granting Clause," provides in relevant part:

> The undersigned photographer, the sole owner of the copyrights in the undersigned's images ("the Images") selected by [DRK] and included in DRK's collection, hereby grants to DRK all copyrights and complete legal title in the Images. DRK agrees to reassign all copyrights and complete legal title back to the undersigned immediately upon completion of the registration of the Images . . . and resolution of infringement claims brought by DRK relating to the Images.

J.A. 411. The second, the "Right-to-Sue Clause," provides in relevant part:

> The undersigned agrees and fully transfers [to DRK] all right, title and interest in any accrued or later accrued claims, causes of action, choses

---

[2] The parties dispute both the propriety of considering this correspondence in conjunction with construing the agreements, as well as the import of the material.

5

in action—which is the personal right to bring a case—or lawsuits, brought to enforce copyrights in the Images . . . .

*Id*. The agreements further call for DRK to divide any recovery obtained from infringement lawsuits evenly with the affected photographer.

Approximately one hundred photographers eventually executed Assignment Agreements with DRK. And, between 2009 and 2010, DRK registered the covered images in its collection with the United States Copyright Office. The related Certificates of Registration denote the relevant photographer as the "author" and DRK as the "copyright claimant." *Id*. at 342–43.

In August 2011, Wiley filed the instant action for declaratory judgment in the United States District Court for the Southern District of New York, alleging that DRK threatened to bring infringement lawsuits against it for exceeding the usage limits set in its licenses. Wiley sought a declaration exonerating it from liability related to 316 particular instances of alleged infringement in which it used images in DRK's collection. (Some images were subject to multiple instances of alleged infringement. *DRK Photo*, 998 F. Supp. 2d at 271. Like the District Court, we use "instances" to refer to an image's *use*, and not to a distinct image. *Id*.) DRK counterclaimed, alleging that Wiley engaged in copyright infringement in 295 of those instances. Of those, 45 involved images for which DRK was the "sole and exclusive" agent of the photographer; the remaining 250 were subject to agreements of the non-exclusive type just described. Special App. 80–82.

The parties each moved for summary judgment. DRK prevailed with respect to images subject to its exclusive representation agreements, and Wiley does not appeal that judgment here. *DRK Photo*, 998 F. Supp. 2d at 286–88. But, as to the images for which DRK was a non-exclusive agent, the District Court granted summary judgment to Wiley and dismissed DRK's infringement claims. It reasoned, first, that because the

Representation Agreements did not render DRK the sole and exclusive agent of the photographers, section 501 of the Act did not permit DRK to prosecute the claim. *Id.* at 275–84. Second, the court found that the Assignment Agreements, too, fell short of providing DRK an adequate basis to sue Wiley because they conveyed nothing more than the right to sue for infringement. *Id.* at 280. Pointing to the statutory origins of copyright and our Court's decision in *Eden Toys, Inc. v. Florelee Undergarment Co.*, the District Court explained that the photographers could not "authorize[] DRK [merely] to bring suit on their behalf." *Id.* (citing *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 n.3 (2d Cir. 1982), *superseded by rule on other grounds as recognized in Fed. Treas. Enterp. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 84 (2d Cir. 2013)). Pointing also to a line of Ninth Circuit cases beginning with its decision en banc in *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881 (9th Cir. 2005), the court ruled that "disguised assignments of the bare right to sue . . . cannot confer [statutory] standing." *DRK Photo*, 998 F. Supp. 2d at 284 (internal quotation marks omitted).

DRK timely appealed the court's grant of summary judgment to Wiley on these claims. On appeal, DRK urges us to conclude that, even with respect to its non-exclusive agency relationships, its Representation and Assignment Agreements sufficed to support its suit against Wiley under the Act and that it is therefore entitled to recover statutory damages for Wiley's allegedly infringing uses.

## DISCUSSION

We review *de novo* a district court's grant of summary judgment, resolving all factual ambiguities and drawing all reasonable factual inferences in favor of the nonmoving party. *Davis v. Blige*, 505 F.3d 90, 97 (2d Cir. 2007).

DRK offers two theories in support of its position that the Act authorizes it to sue Wiley for copyright infringement. First, pointing to the Assignment Agreements'

7

transfer to it of the photographers' rights to sue for infringement, DRK contends that it may bring any action for infringement that the photographers might have pursued. Second, it argues that even if the Copyright Act does not permit suit by an assignee that is not and has never been a legal or beneficial owner of the copyrighted work, the Assignment and Representation Agreements make it sufficiently such an owner to allow it, under the Act, to institute suit.

**I.      If it is merely an assignee of the right to sue for infringement, can DRK prosecute a copyright infringement action?**

DRK first argues that it is entitled to sue Wiley for infringement of the photographs under the Right-to-Sue Clause of the Assignment Agreements. As we have noted, that clause states that the photographers "fully transfer[] [to DRK] all right, title and interest in any accrued or later accrued claims, causes of action, choses in action . . . or lawsuits, brought to enforce copyrights in the Images." J.A. 411. Wiley accepts that DRK and the photographers may have intended in this clause to convey to DRK the right to sue for infringement. It nevertheless contends that a purported assignment of that right, standing alone, is inadequate to allow DRK to assert a claim under section 501(b) of the Act.

Section 501(b) provides in part that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). None dispute that the "exclusive right[s] under a copyright" to which section 501(b) refers are those six "[e]xclusive rights in copyrighted works" enumerated in section 106 of the Act: the right to reproduce the work, prepare derivative works,

8

distribute the work to the public, perform the work, display the work, and perform the work by means of digital transmission. 17 U.S.C. § 106.[3]

Wiley contends and DRK disputes that, in our decisions in *Eden Toys* and *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971 (2d Cir. 1991), we definitively interpreted section 501(b) to preclude suit under the Act by assignees of the bare right to sue that have never held exclusive ownership rights. As discussed below, we are not convinced that these cases compel the conclusion that Wiley claims. We therefore return to the statutory text to determine whether, as DRK submits, it may sue under section 501(b). We address these arguments in turn.

---

[3] In full, section 106, "Exclusive rights in copyrighted works," provides:

> Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
>
> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
>
> (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.

**A.** *Eden Toys* **and** *ABKCO*

We first consider whether these decisions compel dismissal of DRK's infringement action for want of statutory standing.[4] The District Court agreed with Wiley that they do. *See DRK Photo*, 998 F. Supp. 2d at 280. We think, on balance, that neither is dispositive.

*First*, our decision in *Eden Toys* is fairly susceptible to more than one reading on this score. In *Eden Toys*, Paddington and Company, Limited ("Paddington"), the owner of the copyright in the fictional character Paddington Bear, executed a license with Eden Toys, Inc. ("Eden") that made Eden (1) an exclusive licensee for some uses of the primary copyright, and (2) an owner of Eden's derivative works in the copyright. The license granted Eden "the right, at its option, . . . to institute appropriate legal action against [an] infringer [of the primary copyright]," but only in the event that the copyright owner, Paddington, "elect[ed] to take no legal action." *Eden Toys*, 697 F.2d at 30 n. 2. Our Court concluded that Eden could state a cause of action for infringement of its own derivative works and licensed uses, *id.* at 33–37, but not for infringing uses of the primary Paddington Bear copyright, as to which the licensor Paddington retained the right to sue, *id.* at 32–33. In a footnote, we stated that the Copyright Act does not permit "holders of rights under copyrights to choose third parties to bring suits on their behalf." *Id.* at 32 n.3. We noted in brief explanation that "while F[ed]. R. Civ. P. 17(a) ordinarily permits the real party in interest to ratify a suit brought by another party, the Copyright Law is quite specific in stating that only the 'owner of an exclusive right

---

[4] We recognize that, to ensure that the right to sue is not confused with Article III standing, the Supreme Court has discouraged the use of the term "statutory standing." *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.4 (2014). We use the phrase "statutory standing" here for historical reasons, to refer to a plaintiff's right to pursue a cause of action under the Copyright Act. *See, e.g., Buday v. N.Y. Yankees P'ship*, 486 F. App'x 894, 899 (2d Cir. 2012); *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72 (2d Cir. 2013).

under a copyright' may bring suit." *Id.* (internal citations omitted) (quoting 17 U.S.C. § 501(b)). It is on this language that Wiley's stare decisis argument rests.

Competing views of the *Eden Toys* footnote have emerged since we decided the case more than thirty years ago. Some have read the opinion as merely precluding prosecution of an infringement suit by a copyright holder's agent, and offering nothing of substance about the legitimacy of suit based on only an outright assignment. *See Silvers*, 402 F.3d at 910 (Bea, *J.*, dissenting); 3 Melville Nimmer & David Nimmer, *Nimmer on Copyright* § 12.02[C]. Because Eden Toys' license permitted it to sue only subject to a condition—that is, only when the copyright holder elected to forgo its own (primary) right to sue—*Eden Toys* can be read to hold that a license *in the form presented there* is insufficient to convey a cause of action for all infringements of the copyright. In other words, as to infringements of the original copyrighted work, Eden held a mere secondary right to sue, and under the Copyright Act, that assignment was insufficient to allow Eden Toys to sue for infringement. *See Eden Toys*, 697 F.2d at 32 n.3. As some have observed, this reading of the opinion leaves open "[t]he more difficult question . . . whether the assignee of solely an accrued claim and no other copyright interest has standing to sue." 3 Nimmer & Nimmer § 12.02[C].

On the other hand, some have read *Eden Toys* as precluding infringement actions like DRK's. *See DRK Photo*, 998 F. Supp. 2d at 280. This reading, too, has been endorsed by commentators. *See* 6 William Patry, *Patry on Copyright* § 21:5 (citing *Eden Toys* for proposition that "section 501(b) does not permit the copyright owner to retain the copyright, but convey the mere right to sue"). And this was the reading adopted by the Ninth Circuit majority in *Silvers*. In fact, the *Silvers* majority drew partial support for its decision by characterizing it as maintaining consistency with the law of our Circuit. 402 F.3d at 889–90 ("We think it important to parallel the Second Circuit . . . ."). We

11

appreciate the consideration it gave to our prior decision and to the need for a uniform regime.

We need not resolve here which is the better reading of this *Eden Toys* footnote, however, because, as we explain below, we simply read the text of the Copyright Act to preclude infringement suits by assignees of merely the right to sue who do not hold and have not yet held any of the listed exclusive rights. *Eden Toys* at least supports our decision, and no reading of *Eden Toys* prevents us now from adopting that view.

*Second*, our decision in *ABKCO* does not directly address whether the Copyright Act permits suit by a mere assignee of the right to sue. In *ABKCO,* we evaluated the basis for ABKCO's 1980 settlement with George Harrison for his allegedly infringing use of the song "He's So Fine." *See ABKCO*, 944 F.2d at 980–81. ABKCO acquired exclusive rights in the song in 1978, when it purchased the copyright together with "any and all rights assertable under copyright against the Infringing Composition . . . which may have heretofore arisen or which may hereafter arise." *Id.* at 980.  That acquisition occurred eight years after the claims accrued in 1970 and four years after the district court had found liability on the claims at issue. *See id*. at 975.

We decided that ABKCO's rights in the 1980 settlement were based on the owner's transfer to ABKCO of accrued claims for infringement, and not simply on ABKCO's concurrent ownership of exclusive rights under the copyright in "He's So Fine." *Id.* at 981. We explained, "[A] copyright owner can assign its copyright but, if the accrued causes of action are not expressly included in the assignment, the assignee will not be able to prosecute them." *Id.* at 980. We further noted that "the Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf." *Id*. In the event that accrued claims are not expressly included in the assignment, "the assignor retains the right to bring actions accruing during its ownership of the right,

12

even if the actions are brought subsequent to the assignment." *Id.* ABKCO, we concluded, was entitled to participate in the 1980 settlement because it had obtained the right to sue for past infringement. *Id.* at 981.

We acknowledge that some of the language in *ABKCO* seems in tension with the text of section 501(b). But that language must be understood in the context of the complex factual and procedural history of that case. In *ABKCO*, we treated ownership of accrued claims for infringement as assets separate from ownership of an exclusive right, in the sense that assignment of the latter did not necessarily imply assignment of the former. Because ABKCO possessed both the exclusive right allegedly infringed and the accrued claim for infringement (as to which liability had already been adjudicated), that decision did not necessarily resolve the question whether one assigned merely the right to sue for infringement and who has never held any of the exclusive rights listed in section 106 has statutory standing to sue.

In light of the ambiguity of these decisions on this question, we return to the text of the Copyright Act to determine afresh whether it allows such plaintiffs to pursue infringement suits.

**B. Whether the Copyright Act permits suit by mere assignees of the bare right to sue**

Our analysis begins with the statutory language. *See In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 427 (2d Cir. 2009) ("Statutory interpretation always begins with the plain language of the statute . . . ." (internal quotation marks omitted)). Section 501(b) provides:

> The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it. The court may require such owner to serve written notice of the action with a copy of the complaint upon any person shown,

13

by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright, and shall require that such notice be served upon any person whose interest is likely to be affected by a decision in the case. The court may require the joinder, and shall permit the intervention, of any person having or claiming an interest in the copyright.

17 U.S.C. § 501(b).

The most natural reading of this provision, it seems to us, is that by identifying who may bring suit under the Act, Congress signaled that others may not. As the District Court correctly observed, "This right [in copyright] . . . does not exist at common law [in the United States]—it originated, if at all, under the acts of [C]ongress." *DRK Photo*, 998 F. Supp. 2d at 276 (quoting *Wheaton v. Peters*, 33 U.S. 591, 663–64 (1834)). A suit for infringement is thus a "creature of statute." *Silvers*, 402 F.3d at 883–84. This being so, Congress may determine—and limit, if it so chooses—who may enforce the rights it has created.

Further, the interpretive canon of *expressio unius est exclusio alterius* instructs that Congress's expression of one or several items in an enumerated list typically reflects an intent to "exclude[] another left unmentioned." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (internal quotation marks omitted).  In the Copyright Act, Congress expressly provided a cause of action for infringement only for "legal or beneficial owner[s]" of one of the six enumerated "exclusive right[s] under a copyright." 17 U.S.C. § 501(b). The right to sue is conspicuously absent from the list of exclusive rights. *See* 17 U.S.C. § 106. The plain language of the Act does not authorize infringement actions by mere assignees of the bare right to sue – entities that do not hold and indeed never held any section 106 exclusive right in the allegedly infringed-upon work.

The special features of copyright make the application of the *expressio unius* canon especially appropriate. In enacting and amending the Copyright Act, Congress

14

legislates regarding a property interest that carries special and deep-rooted public policy concerns. *See Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (noting that "copyright's purpose is to promote the creation and publication of free expression" (emphasis omitted)); *see also* U.S. Const. art. I, § 8, cl. 8 (establishing congressional power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries"). The copyright regime that Congress had adopted and over time amended reflects a legislative balancing of rights and duties with unique features. *See Eldred*, 537 U.S. at 219. For example, an action for infringement is not simply one for a readily ascertainable debt for a sum certain: copyright infringement claims are multifaceted and complex. We are reluctant to risk disturbing the balance that Congress settled on by reading into the Act features that Congress has not expressly adopted.

Our reluctance in this respect takes on particular importance in section 501(b), where Congress appears to have taken care to craft limits on the right to sue. For example, section 501(b) prevents even holders of one of the six exclusive section 106 rights from suing unless the alleged infringement occurred "while he or she [was] the owner of it." 17 U.S.C. § 501(b). We read this "durational limitation," as did the *Silvers* majority, as reflecting an effort to "carefully circumscribe[]" the right to sue for infringement, marking an additional reason not to inject an additional untethered right to sue into the congressional silence. *Silvers*, 402 F.3d at 885; *see also DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC* ("*McGraw-Hill*"), 870 F.3d 978, 988 (9th Cir. 2017)).[5]

---

[5] Following oral argument in this appeal, the Ninth Circuit decided that DRK lacked standing in a similar case, in which DRK sued McGraw-Hill, another publisher, for infringement. *DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d at 988. Wiley (here, the plaintiff publisher seeking declaratory judgment against DRK) brought the decision to our attention

We also find persuasive the observation that Congress failed entirely in section 501(b) to make any mention of or accommodation for entities that are mere assignees of the right to sue and whose rights are divorced from all of the exclusive rights. Thus, in addition to setting out who may sue, section 501(b) contains notice and joinder provisions intended to ensure in infringement suits that "other owners whose rights may be affected are notified and given a chance to join the action." H.R. Rep. No. 94-1476, at 159 (1976). The statute thus allows courts to "require the joinder . . . of any person having or claiming an interest in the copyright," or to require that a plaintiff alleging infringement "serve written notice of the action with a copy of the complaint upon any person shown . . . to have or claim an interest in the copyright." 17 U.S.C. § 501(b). Notice and joinder, however, are expressly invited only in suits brought by a

---

through a Rule 28(j) letter and argued that the Ninth Circuit ruling moots the instant appeal by application of collateral estoppel principles against DRK with regard to DRK's statutory standing to assert infringement counter-claims against Wiley.

Collateral estoppel may apply when "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 162 F.3d 724, 731 (2d Cir. 1998). Courts are not obligated, however, to apply collateral estoppel to bar the affirmative assertion of claims. *See, e.g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) ("We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied."); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 303–04 (2d Cir. 1999) ("When the efficiency rationale for collateral estoppel fails, however, courts have understandably declined to adopt the doctrine."); *Olegario v. United States*, 629 F.2d 204, 215 (2d Cir. 1980) (declining to apply doctrine because "case raises important issues of national concern").

Here, exercising our discretion, we decline to apply collateral estoppel against DRK for several reasons. First, this case presents an issue of importance in this Circuit, worthy of independent consideration. Second, the issues have already been fully briefed and argued, so judicial efficiency would not be served by estopping DRK from proceeding. Third, DRK may yet choose to challenge the Ninth Circuit decision through a petition for certiorari: the Ninth Circuit decision, as of this writing, is not yet final.

"legal or beneficial owner" of an enumerated copyright right under the Act. *Id.* As already noted, the right to sue is not one of those enumerated rights. *See id*. § 106. Silence in this provision, too, provides further evidence of Congress's anticipation of suit only by those it named.

Finally, we recognize that a central thrust of the 1976 modifications to the Copyright Act, which enacted section 106, was to abandon the prohibition on divisibility of copyright that courts had read into the 1909 version of the Act. *See* H.R. Rep. No. 94-1476, at 61 (noting that section 106 creates a "'bundle of rights' that is a copyright," which "may be subdivided indefinitely"). The introduction of section 106 suggests to some that Congress has invited, or at least not forbidden, further unbundling of manifold rights, such as would permit recognition of rights to sue in mere assignees of the right to sue that hold none of the exclusive rights. *Silvers*, 402 F.3d at 896–99 (Bea, *J.*, dissenting). But, although the 1976 modification certainly effected an expansion of actionable rights under the Act and the House report includes a phrase heralding "indefinite[]" subdivision, the expansion was accomplished primarily through the enactment of section 106. That section—as apparent from its text—identifies only six particular alienable elements. Given the importance of this section in effectuating Congress's goal to render copyrights divisible, Congress's omission from it of the right to sue for infringement as a separate exclusive right strikes us as especially significant.

### C. Whether background principles of federal common law overcome the plain reading of the Act

DRK argues that our reading of the Act ignores background common law principles that permit the free assignability of federal claims. It asserts, in particular, that our holding "is not valid" after *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269 (2008). Appellant's Br. at 59. We cannot agree.

17

In *Sprint*, the Supreme Court considered whether an assignee of an injured party's claim for monies owed under the Federal Communications Act had constitutional standing to pursue that claim. 554 U.S. at 271. As part of its reasoning, the Court undertook an analysis of the history of the assignability of claims, ultimately finding that "throughout the 19th century, American courts regularly exercised their powers in favor of the assignee" of a chose in action.[6] *Id.* at 278 (internal quotation marks omitted). This trend toward assignability, the Court concluded, provided a basis for conferring standing on the aggregators of claims for purposes of collection. *Id.* at 285. Although the Supreme Court's decision in *Sprint* focused on constitutional and prudential standing, the majority opinion hints at the Court's recognition of a generally permissive regime for the assignment of federal causes of action, at least for some categories of statutory claims. *See id.* at 285–86; *see also United States v. Texas*, 507 U.S. 529, 534 (1993) (noting that federal statutes should be "read with a presumption favoring the retention of long-established and familiar principles").

But whether any trend toward assignability should apply in the copyright context is a different matter. Even assuming that congressional silence may, in general, reflect an intention not to preclude suit on assigned claims, we do not think it follows that such an interpretive principle would govern copyright claims. To the contrary, we see reason to conclude that the trend towards liberal assignability of claims reflected in *Sprint* should not reach copyright infringement claims. *See McGraw-Hill*, 870 F.3d at 988 ("*Sprint* does not undercut the reasoning of *Silvers*, which was grounded on the specific

---

[6] A chose in action is "an interest in property not immediately reducible to possession." *Sprint*, 554 U.S. at 275. It includes "a financial interest such as a debt, a legal claim for money, or a contractual right." *Id*. The Fifth Circuit has construed copyright infringement claims as choses in action. *See Prather v. Neva Paperbacks, Inc.*, 410 F.2d 698, 699–700 (5th Cir. 1969).

18

statutory language and history of the Copyright Act's standing provision for infringement claims").

Despite what may be modern expansions of the right to sue, assignability of litigation claims is not universally countenanced. It remains constrained in many jurisdictions by common law prohibitions on maintenance,[7] champerty,[8] and barratry[9]—doctrines that developed to ensure the authenticity of lawsuits and the bona fides and commitment of the parties prosecuting them. *See Sprint*, 554 U.S. at 306 (Roberts, *C.J.*, dissenting) (discussing champerty and maintenance); *see also* Anthony J. Sebok, *The Inauthentic Claim*, 64 Vand. L. Rev. 61, 62, 107 (2011) (reporting that only twenty-eight states "permit maintenance in some form" and that of these, only "sixteen explicitly permit maintenance for profit"); Susan Lorde Martin, *Syndicated Lawsuits: Illegal Champerty or New Business Opportunity?*, 30 Am. Bus. L.J. 485, 488 (1992) (noting that "[a]t least ten states have statutes which . . . prohibit barratry" and "[i]n Maine and Mississippi, champerty is a crime").

---

[7] Blackstone defined maintenance as the "officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party, with money or otherwise, to prosecute or defend it." 4 William Blackstone, *Commentaries on the Laws of England*, at \*134–35 (1765) (William Draper Lewis, ed., 1922); *see also Sprint*, 554 U.S. at 306 n.3 (Roberts, *C.J.*, dissenting). At common law, maintenance was considered to be "an offence against public justice, as it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression." *Sprint*, 554 U.S. at 306 n.3 (Roberts, *C.J.*, dissenting) (internal quotation marks omitted).

[8] Champerty is "a species of maintenance . . . being a bargain with a plaintiff or defendant *campum partire*, to divide the land or other matter sued for between them, if they prevail at law; whereupon the champertor is to carry on the party's suit at his own expense." 4 Blackstone, *Commentaries,* at \*135; *see also Sprint*, 554 U.S. at 306 n.3 (Roberts, *C.J.*, dissenting).

[9] Barratry is "frequently exciting and stirring up suits and quarrels." 4 Blackstone, *Commentaries*, at \*154; *see also* Susan Lorde Martin, *Syndicated Lawsuits: Illegal Champerty or New Business Opportunity?*, 30 Am. Bus. L.J. 485 (1992) (discussing state laws concerning barratry).

19

Even in the context of congressionally created causes of action, federal law does uniformly not permit suit based on a bare assigned claim. Indeed, such suits are not permitted under patent law, an area by tradition seen as closely related to copyright. *See Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1536 (2017) (noting that patent law and copyright "share a 'strong similarity . . . and identity of purpose'" (quoting *Bauer & Cie* v. *O'Donnell*, 229 U. S. 1, 13 (1913))). In its seminal decision in *Crown Die & Tool Co. v. Nye Tool & Machine Works*, the Supreme Court held that the right to sue for past patent infringement is not a chose in action that is freely assignable under common law principles. 261 U.S. 24, 40 (1923). As the *Crown Die* Court explained, "It is the fact that the patentee has invented or discovered something useful and thus has the common-law right to make, use and vend it himself which induces the government to clothe him with the power to exclude every one else from making, using or vending it." *Id.* at 36. Accordingly, the right to exclude other patent uses is merely the "chief incident of" the patent holder's own common law rights, which flow from the discovery or invention. *Id.* The "incident of exclusive ownership," the Court explained, "can not be enjoyed save with the common-law right." *Id.* Moreover, the right to sue for patent infringement is not otherwise transferable as a chose in action at common law, the Court taught, because "[p]atent property is the creature of statute law and its incidents are equally so and depend upon the construction to be given to the statutes creating it and them, in view of the policy of Congress in their enactment." *Id.* at 40. In absence of congressional authorization, the monopoly created by the Patent Act—including, chiefly, the right to exclude others from using it—"cannot be regulated by the rules of the common law." *Id.*

The Supreme Court has long recognized patent law's strong and "historic kinship" with copyright law, a kinship that is reflected in the Constitution. *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 439 (1984); *accord Impression Prod., Inc.*, 137 S.

20

Ct. at 1536; *Bauer & Cie*, 229 U. S. at 13. Applying the logic of *Crown Die*, we are inclined, despite the age of that decision, to see the right to sue for copyright infringement still as an incidental privilege of ownership of a right to a copyrightable work. Absent express congressional authorization for suit by a transferee of the bare right to sue for infringement, this "incidental privilege" of copyright ownership strikes us as, similar to a patent holder's right, not independently transferable under the current congressionally enacted copyright regime.

Some have argued against applying an analogy to patent law in this context, correctly observing that the patent law regime differs from copyright law in that the exclusive rights under a patent are not divisible. *See e.g.*, *Silvers*, 402 F.3d at 904–05 (Bea, *J.*, dissenting). The Supreme Court in *Crown Die*, however, acknowledged the non-divisibility of the rights under a patent, 261 U.S. at 37, and we think its holding in that case did not rest in any fundamental way upon this observation. Instead, its holding rested on: (1) the Court's characterization of the right to exclude other patent users (through suit, if necessary) as incident to—that is, coupled with—the common law rights flowing from the invention or discovery itself, *id.* at 36, and (2) the absence of any statutory provision authorizing the transfer of the right to sue for patent infringement as a chose in action, *id.* at 40.

We are also unconvinced by the argument that we must disclaim any analogy to patent law because in patent law, disclosure is "the *quid pro quo* of the right to exclude," whereas in copyright law, disclosure is the "desired objective." *Silvers*, 402 F.3d at 894 (Berzon, *J.*, dissenting) (internal quotation marks omitted). In our view, that difference does not suffice to convert the "incidental privilege" that is the right to sue (in the patent law context) into an independent and fully transferable interest (in the copyright context). Rather, in each case, disclosure and protection are aimed at accomplishing the goals set out in the Constitution: "To promote the Progress of Science and useful Arts,

by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. At the least, *Crown Die* suggests to us that the realm of intellectual property law has special characteristics that place it outside of any generally permissive regime for the assignment of federal claims. *See Crown Die*, 261 U.S. at 40 ("[I]t is not safe . . . in dealing with a transfer of rights under the patent law to follow implicitly the rules governing a transfer of rights in a chose in action at common law.").

We are persuaded from our reading of the Act, as informed by long-adhered-to practices in the intellectual property realm, that the Act does not permit a plaintiff assignee to bring a claim for infringement without also having or having had a legal or beneficial ownership in some exclusive right under part of the allegedly infringed copyright.

**II.     Whether DRK is a legal or beneficial owner of an exclusive right**

Finally, DRK contends that it should be permitted to sue Wiley for infringement because the Representation Agreements and the Assignment Agreements make it either a legal owner or a beneficial owner of an exclusive right in copyright in the images. We conclude that neither argument carries the day.

**A.  Legal ownership**

Legal ownership of the exclusive rights under a copyright initially vests in the author of the copyrighted work. 17 U.S.C. § 201(a). The author may transfer all or a subset of these rights "by any means of conveyance or by operation of law." *Id*. § 201(d)(1).[10] After transfer, the new owner of a particular exclusive right is "entitled, to

---

[10] Section 201(d) of title 17 provides:

22

the extent of that right, to all of the protection and remedies accorded to the copyright owner." *Id*. § 201(d)(2).

Owners of exclusive rights may grant essentially two types of licenses, exclusive and non-exclusive, authorizing others to use their rights. *Blige*, 505 F.3d at 99–100. The type of license conferred has important implications for the scope of the licensee's privileges under the Copyright Act. An exclusive licensee holds "the exclusive right—superior even to copyright owners' rights—to use the copyrighted work in a manner as specified by the license agreement," and may exclude others entirely from using the copyrighted work. *Id.* at 99. Although an exclusive licensee "is capable of breaching the contractual obligations imposed on it by the license," it "cannot be liable for infringing the copyright rights conveyed to it." *U. S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991). In contrast, a non-exclusive license merely permits the licensee "to use the copyrighted material." *Blige*, 505 F.3d at 99. Such licenses "may be granted to multiple licensees," *id.*, and serve only to "immunize[] the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor," *id.* at 100. Accordingly, an exclusive licensee is a "legal owner" of an exclusive

---

(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

(2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

17 U.S.C. § 201(d).

right for purposes of a copyright infringement action under section 501(b), *see id.* at 100 n.10, whereas a non-exclusive licensee is not, *see Eden Toys*, 697 F.2d at 32.

DRK argues that, by making it the photographers' licensing agent, the Representation Agreements convey the exclusive right to authorize reproduction of the images. *See, e.g.*, J.A. 294. Further, DRK says, the Granting Clause of the Assignment Agreements unambiguously conveys "all copyrights and complete legal title in the Images." *See, e.g., id.* at 411. In our view, neither set of agreements gives DRK a sufficient legal ownership interest to satisfy section 501.

### 1. The Representation Agreements

We can dispense in short order with the Representation Agreements as a potential source of legal ownership. These agreements merely make DRK one of potentially many agents of each photographer. They provide only that "[the photographer] desire[s] that [DRK] act as [the photographer's] agent with respect to the sale or leasing of the photographs or transparencies." J.A. 294. Nothing in the agreements purports to establish an exclusive principal-agent relationship with respect to either photographer or image. In contrast, other DRK agreements, not at issue here, make DRK the "sole and exclusive agent" of the relevant photographers. *Id*. at 292. Thus, the Representation Agreements here fail on their face to convey an exclusive right in copyright to DRK, as section 501 requires. *See McGraw-Hill*, 870 F.3d at 984–85.

### 2. The Assignment Agreements

The import of the Assignment Agreements is not so evident.[11] The Granting Clause of these agreements purports to convey not just some of the exclusive rights

---

[11] The reader will recall that the Assignment Agreements contain a Granting Clause and a Right-to-Sue Clause. The Granting Clause provides:

under the copyrights in the images, but "*all* copyrights and *complete* legal title." J.A. 411 (emphasis added). Thus, the agreements on their face appear designed to convey to DRK *all* of the exclusive rights under copyright in the images.

The District Court heavily discounted this contractual language, concluding that the actual effect of the agreements was merely to convey the bare right to sue for infringement. *DRK Photo*, 998 F. Supp. 2d at 280–84. In doing so, it relied on the Granting Clause's requirement that DRK reassign the copyright to the photographers "immediately upon . . . resolution of infringement claims" brought by DRK; it also cited persuasive and extensive extrinsic evidence in the form of DRK's contemporaneous emails with the photographers. *Id.* at 281–82. But DRK convincingly argues that the court failed to consider adequately whether it was entitled to look beyond the plain language of the contracts in conducting its analysis.[12] Nevertheless, undertaking that

> The undersigned photographer, the sole owner of the copyrights in the undersigned's images ("the Images") selected by DRK Photo ("DRK") and included in DRK's collection, hereby grants to DRK all copyrights and complete legal title in the Images. DRK agrees to reassign all copyrights and complete legal title back to the undersigned immediately upon completion of the registration of the Images . . . and resolution of infringement claims brought by DRK relating to the Images.

J.A. 411. The Right-to-Sue Clause provides:

> The undersigned agrees and fully transfers [to DRK] all right, title and interest in any accrued or later accrued claims, causes of action, choses in action—which is the personal right to bring a case—or lawsuits, brought to enforce copyrights in the Images . . . .

*Id*.

[12] Wiley complains that DRK failed to argue before the District Court that the parol evidence rule bars consideration of the extrinsic evidence here, and argues that DRK has forfeited the argument. Although we could treat the argument as forfeited, our forfeiture rule is prudential.

25

analysis, we conclude that applicable state law permits consideration of extrinsic evidence in this case, and that the evidence, coupled with the re-conveyance language in the Agreements, demonstrates beyond any genuine dispute that DRK lacks legal ownership of an exclusive right.[13]

It is well settled that state law rules of contract construction govern the interpretation of copyright transfer agreements, notwithstanding the federal statutory source of the rights at issue. *Graham v. James*, 144 F.3d 229, 237 (2d Cir. 1998). Accordingly, to the extent that state law follows the parol evidence rule, federal courts should apply that rule in interpreting copyright transfer agreements. We must thus consider which state's rules of contract construction apply here.

The Assignment Agreements contain no choice of law provision, and it is an open question whether federal common law or the law of the forum state—here, New York—supplies the correct choice of law framework in the context of copyright-related agreements. *See generally Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir.

We elect to consider DRK's contention. *Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir. 2000) (explaining that our Court generally "does not consider an issue not passed upon below," but that we "retain broad discretion to consider issues not raised initially in the District Court").

[13] The District Court did not consider whether the parol evidence rule would prevent it from relying on extrinsic evidence when determining the intent of the parties in executing the Assignment Agreements. Rather, the court simply referred to the principle—adopted by many other Circuits—that federal courts interpreting copyright transfer agreements should "look not just at the labels parties use but also at the substance and effect of the contract." *DRK Photo*, 998 F. Supp. 2d at 280 (quoting *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169 (9th Cir. 2013)); *see also HyperQuest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377, 383 (7th Cir. 2011) (collecting cases). But this principle does not contemplate the use of extrinsic evidence. *See Righthaven*, 716 F.3d at 1171 (declining to consider extrinsic evidence of the parties' intent because the agreement "was not ambiguous"). Although the District Court's decision did not address whether the parol evidence rule would prevent it from relying on evidence outside the document's four corners, we may affirm on any ground appearing in the record. *See Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (per curiam).

1996). But we need not settle the issue now. The Restatement (Second) of Conflict of Laws, to which both New York and federal courts look, declares that courts will apply the laws of the state that "has the most significant relationship to the transaction and the parties." Restatement (Second) of Conflict of Laws § 188 (1971); *see also Pescatore*, 97 F.3d at 12; *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317–18 (1994).

In this case, the state of Arizona has the most significant relationship to the assignment transaction and the parties. The photographers resided in various locations around the globe when they executed the agreements, *see, e.g.*, J.A. 411 (United Kingdom), 415 (New York), but DRK was always located in Arizona, where sole proprietor Daniel Krasemann does business. DRK executed the agreements in Arizona and performed its obligations under the Registration Agreements—registering the images with the Copyright Office and bringing any infringement lawsuits—from its base of operations there. In contrast, other than transferring copyright ownership to DRK by signing the document, the photographers had no responsibilities under the agreements. Moreover, the subject matter of the agreements—photographs contained in DRK's collection—was physically located in Arizona, under DRK's control. No single jurisdiction has a closer tie to the agreements.[14] Therefore, Arizona law governs.

Arizona follows a modified version of the parol evidence rule. *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 154 (1993). In its standard formulation, the parol evidence rule prohibits consideration of extrinsic evidence unless a contract's written terms manifest a facial ambiguity. *See, e.g.*, *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162–63 (1990) (New York law). Under the Arizona rule, by contrast, a court may consider extrinsic evidence as a preliminary matter to determine whether the "contract

---

[14] Wiley's location in New York has no bearing on the issue, of course, because Wiley was not a party to the Assignment Agreements.

language is reasonably susceptible to the interpretation asserted by its proponent." *Taylor*, 175 Ariz. at 154. As we understand it, if, based on extrinsic evidence, the (Arizona) judge finds the contract ambiguous as a preliminary matter, then "the evidence is admissible to determine the meaning intended by the parties." *Id*.

Wiley proposes, based on extrinsic evidence, that the Registration Agreements should be read as transferring title to the copyrights for purposes of registration and filing suit, but leaving ownership and control of the exclusive rights that accompany copyright ownership entirely with the photographers. *See Morris v. Bus. Concepts, Inc.*, 259 F.3d 65, 69–71 (2d Cir. 2001) (concluding that the owner of a copyright for registration purposes may be different than the owner of an exclusive right under copyright), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010). We think the Granting Clauses are reasonably susceptible to Wiley's interpretation. Under Arizona law, therefore, we may examine the extrinsic evidence to determine the parties' intentions.

The record evidence viewed as a whole tends to confirm that the Assignment Agreements were not actually intended to convey to DRK any of the photographers' exclusive rights in copyright. For example, DRK explained in its cover email transmitting the Assignment Agreements to the photographers that the documents' purpose was for the photographers to "receive the piece [*sic*] of mind of knowing that many of your images will be registered with the United States Copyright Office," and for DRK to "receive the authorization necessary to initiate and settle copyright infringement claims brought against would be infringers of DRK Photo images." J.A. 205. Additionally, DRK informed one photographer in a related email exchange that the agreement would not alter the photographer's relationship with other stock photography agencies, *id*. at 217, and told another that "there is no 'rights grab' going

28

on here," *id*. at 224.[15] Indeed, DRK's proprietor testified in his deposition that he believed DRK had a "non-exclusive" relationship with the photographers, under which the latter were entitled to license their images independently of DRK. *Id*. at 260–62.

In light of this evidence, we see no genuine dispute that the language of the Assignment Agreements was intended to, and did, convey only (1) an interest in the images for registration purposes, and (2) the bare right to sue for infringement. Neither of these rights is among the exclusive rights set forth in section 106. Accordingly, their transfer to DRK does not make DRK a legal owner of an exclusive right for purposes of the private right of action section, section 501(b). The Ninth Circuit recently held the same when faced with a meaningfully similar agreement. *McGraw-Hill*, 870 F.3d at 987 ("The undisputed evidence shows that for all practical purposes, the nonexclusive Representation Agreements continued to govern who controlled the exclusive rights associated with the photographs following execution of the purported copyright assignments; thus, the substance and effect of the Assignment Agreements was merely a transfer of the right to sue on accrued claims, which cannot confer standing.").

Because neither the Representation Agreements nor the Assignment Agreements transfer an exclusive right in copyright to DRK, it does not have a legal ownership interest sufficient under the statute to assert a cause of action for infringement.

**B.  Beneficial ownership**

DRK next contends that, legal ownership aside, the Representation Agreements and Assignment Agreements make it a beneficial owner of exclusive rights in the

---

[15] DRK objects that much of the extrinsic evidence submitted by Wiley relates merely to *some* of the photographers with whom it executed Assignment Agreements—intimating that the scope of the agreements might vary by photographer. We are not persuaded: DRK points to no record evidence suggesting that its intent in obtaining the Assignment Agreements varied from client to client.

images. In support, DRK argues that by virtue of the agreements, it has a "legitimate and important role" to play in protecting the copyrights in the images; a "direct interest" in how the copyrights are used; and an effective position from which to "efficiently prosecute" infringement suits. Appellant's Br. at 48–49. Although we sympathize with the practical concerns raised by DRK, in our view, these circumstances do not suffice under the Act to create out of whole cloth and recognize a novel beneficial ownership interest with the goal of permitting DRK to sue for copyright infringement on its own behalf or on behalf of the photographers.[16]

The statute does not define the phrase "beneficial owner," and the circumstances in which a person or entity becomes a beneficial owner with a cause of action for infringement have not been explored by our Court in much detail. The paradigmatic—and only—example of an approved "beneficial owner" suit is set forth in the legislative history of the Copyright Act, which describes the term "beneficial owner" as "includ[ing], for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees." H.R. Rep. No. 94-1476, at 159. Our Court has endorsed this example and explained that the beneficial ownership provision protects a person from having his or her equitable interest in a copyright "diluted or lessened by a wrongdoer's infringement," affording the holder of

---

[16] We note that the concern raised by DRK—the need to afford small copyright holders a viable and cost-effective means to secure their interests and protect their words—is well-recognized, and has been explored recently by the Copyright Office, which has proposed various legislative and administrative solutions. The Register of Copyrights, U.S. Copyright Office, *Copyright Small Claims* 3–4 (2013), https://www.copyright.gov/docs/smallclaims/usco-smallcopyrightclaims.pdf. A promising solution—a regulated market for copyright claims—has also been touted by some scholars. *See, e.g.*, Shyamkrishna Balganesh, *Copyright Infringement Markets*, 113 Colum. L. Rev. 2277, 2306 (2013). As currently framed, however, the Act as we read it simply does not authorize the remedy proposed by DRK.

the equitable interest the right to seek damages under the Act. *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984).

We have not had occasion to decide whether beneficial ownership may extend beyond the circumstance of an author transferring exclusive rights in exchange for royalty payments. Assuming without deciding that it may, we nonetheless conclude that DRK does not have such a beneficial ownership interest here. Even an expansive definition of beneficial ownership must have limits. At least one limit is readily supplied by the Act itself, which recognizes a cause of action only in the "beneficial owner of an *exclusive right*." 17 U.S.C. § 501(b) (emphasis added). Accordingly, at most, a person would become a "beneficial owner" for purposes of section 501(b) upon obtaining an equitable interest in an *exclusive* right under a copyright. *See Cortner*, 732 F.2d. at 270–71. It is therefore not enough that a putative beneficial owner obtains a mere interest in a copyright, even if that interest is valuable. The interest must be one that derives its value directly from another person's use of an exclusive right, such that the interest is necessarily "diluted" by infringement. *See id.* at 271.

Here, as discussed above, neither the Representation Agreements nor the Assignment Agreements convey any exclusive rights. Instead, under those agreements DRK simply acts as a non-exclusive agent of the photographers in granting licenses to publishers. Nothing prevents the publishers from obtaining licenses to use the images from other agents, or, indeed, from the photographers themselves. DRK's interest is, of course, ultimately traceable to the photographers' exclusive rights, insofar as DRK is permitted to license uses of the images only because the photographers holding the exclusive rights in their works allow DRK to act as their agent. But DRK is not entitled to any proceeds from the photographers' own use of their retained rights or those fees obtained by other agents. Indeed, DRK is not entitled to *any* proceeds at all unless it is directly responsible for issuing a license. Because DRK is only one of potentially

31

numerous entities that potentially can generate revenue from use of the images, DRK's interest in the images does not make DRK a beneficial owner of an exclusive right. Section 501 therefore does not allow it to sue Wiley based on Wiley's alleged infringement. *See McGraw-Hill*, 870 F.3d at 988 (concluding under similar circumstances that to find DRK a beneficial owner would "render portions of section 501(b) superfluous").

In sum, we see equitable merit in allowing stock photography companies like DRK to aggregate copyright infringement claims otherwise accrued to their clients. Aggregation could provide a practical means of forestalling and compensating for repeated small infringements and Congress might reasonably have chosen to permit such aggregation by assignment. But, as drafted, the Copyright Act does not, in our reading, permit DRK to assert those claims when it has received nothing more than the bare right to sue for infringement and has never held an exclusive right under copyright in the photographs. It is for Congress, not our Court, to say otherwise.

**CONCLUSION**

We have considered DRK's remaining arguments and find them to be without merit. We conclude that the District Court correctly held that a bare assignee that does not hold and has never held any other exclusive rights in copyright, may not bring a cause of action for copyright infringement. Further, we decide that DRK is not a legal or beneficial owner of an exclusive right under a copyright in the photographers' images. We therefore AFFIRM the judgment of the District Court.

32

BARRINGTON D. PARKER, Circuit Judge, dissenting:

John Wiley & Sons, Inc. purchased from photographers for relatively small amounts of money the right to use their works in various of its publications. Wiley then proceeded to use the photographs in additional instances for which it had not obtained permission and for which it did not pay the photographers. The crux of this lawsuit is whether the Copyright Act permits this misappropriation. Stock photography companies like DRK Photo are in the business of aggregating copyright infringement claims that have accrued to their clients. Aggregation provides, as the majority acknowledges, a practical means of affording redress to the photographers and compensating them for repeated small infringements of their copyrights. The dispositive legal issue in this appeal is whether the copyright laws forbid the assignment of a bare right to sue on copyright claims to entities such as DRK. Because I conclude that the law does not forbid such assignments, I respectfully dissent.

The majority and I are in accord that § 501(b) of the 1976 Copyright Act, 17 U.S.C. § 101 *et seq.* (the "1976 Act"), does not directly address whether a copyright holder may assign the right to sue and that the Act is silent on the assignability of claims. That section was included in the 1976 Act in the context

1

of a long history grounded in common law and modern federal law permitting the assignment of claims as an essential component of property ownership. As discussed below, we know for certain that when Congress crafts laws such as the 1976 Act, silence on a fundamental common-law principle indicates an intention for that principle to remain in force as part of the statutory scheme, especially since Congress has broken its silence many times explicitly to prohibit suits on assigned claims. In my view, the case ends once these principles are acknowledged and applied.

I agree with the majority on other points. We agree that the District Court erred by concluding that this Court's prior precedent–*Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2d Cir. 1982)–dictates the outcome of this appeal. We agree that § 501(b) is silent on the question of the assignability of claims and that our main disagreement is about how to interpret that silence.

It is clear that prior to the enactment of the 1976 Act, the bar to suit on assigned claims erected by the majority did not exist. *See Silvers v. Sony Pictures*, 402 F.3d 881, 896 (9th Cir. 2005) (Bea, J., dissenting). Under the Copyright Act of 1909 (the "1909 Act"), the "proprietor" of a copyright was afforded the right to sue for copyright infringement. Even though the 1909 Act granted standing

2

solely to the "proprietor" of the entire copyright, courts nevertheless allowed assignees of an accrued cause of action for copyright infringement to sue for infringement. *Id.*; *see also Prather v. Neva Paperbacks, Inc.*, 410 F.2d 698, 700 (5th Cir. 1969) (assignee of accrued cause of action had standing to sue for copyright infringement). As Judge Bea noted, "[t]he infringement claim, like any other contingent asset, could be sold, much like the copyright holders's claim against a trade debtor or a coupon clipped from the copyright holder's bond portfolio," and all defenses against the assignor were valid against the assignee who stood in the shoes of the assignor. *Silvers*, 402 F.3d at 897.

This conclusion concerning the general assignment of causes of action is congruent with unusually well-established law. In *Welch v. Mandeville*, 14 U.S. (1 Wheat.) 233 (1816) (Story, J.), for example, the Supreme Court held that "[c]ourts of law, following . . . the rules of equity, now take notice of assignments of choses in action, and exert themselves to afford them every support and protection. . . ." *Id.* at 236. Numerous other cases have applied this principle and treat the right to bring a cause of action as a right separate from the particular property that gave rise to the right. *See, e.g., ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991) ("a copyright owner can assign its copyright but, if the

3

accrued causes of action are not expressly included in the assignment, the assignee will not be able to prosecute them"); *Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey*, 85 F.3d 970, 974 (2d Cir. 1996) (federal securities law claims may be assigned but the assignment must be express, instead of automatic, upon the sale of the underlying security).  And even antitrust claims have long been held to be assignable, even though the federal antitrust laws, such as the Sherman Act, do not expressly permit assignment.  *See, e.g., D'Ippolito v. Cities Serv. Co.*, 374 F.2d 643, 647 (2d Cir. 1967) ("Antitrust claims have been held assignable.  The most frequent example seems to be the assignment of claims by members of a non-profit trade association to the association."); *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 100, 103 (2d Cir. 2007) (noting that antitrust claims are generally assignable and holding that an assignment of class representative status in an antitrust action is permissible and does not constitute champerty).  Further, under the Restatement (Second) of Contracts § 317(2)(b) (1981), contract rights are assignable unless the assignment is forbidden by statute.

This common law principle applies with full force to comprehensive statutory regulatory schemes fashioned by Congress.  In *Sprint Communications*

4

*Co. v. APCC Services, Inc.*, 554 U.S. 269, 285–86 (2008), the Supreme Court held that the assignee of an injured party's claim for monies owed to the injured party under the Federal Communications Act could sue for the injured party's claims even though the statute was silent on that question.  The Court emphasized that "history and precedent are clear. . . .  Assignees of a claim . . . have long been permitted to bring suit."  *Sprint*, 554 U.S. at 275; *see also, e.g.*, *Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir. 1993) (Alito, J.) (RICO claims are assignable, and, because the civil RICO statute was modeled after Section 4 of the Clayton Act, 15 U.S.C. § 15, for which an express assignment is required, an assignment of a RICO claim must also be express); *Montefiore Medical Ctr. v. Teamsters Local 272*, 642 F.3d 321, 328-29 (2d Cir. 2011) (an ERISA beneficiary may assign his or her claim to a healthcare provider even though ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)) provides that a civil action may be brought "by a participant or beneficiary" of an ERISA plan, and even though that provision is generally "narrowly construed to permit only the enumerated parties to sue directly for relief").

The 1976 Act effected major changes to the 1909 regime in response to a wide variety of new techniques for capturing printed matter, sounds, and

5

images. Congress undertook to divide and subdivide copyright uses in light of the wide variety of new methods of reproduction and distribution. Congress concluded that achieving this goal required a mechanism whereby previously-barred owners of exclusive licenses could sue for copyright infringement. To accomplish this result, Congress enacted § 501 to provide access to the courts for the owner of one or more rights to "exclusive" use. But, tellingly, Congress did not mention the right of the owner of the overall copyright to sue. *Silvers*, 402 F.3d at 898 (Bea, J., dissenting). As Judge Bea correctly observed, ". . . nothing in the 1976 Act eliminated the rights of copyright owners under Section 101 of the 1909 Act to their remedies, nor the right of property owners to enjoy the property rights granted by the statute including the assignment and enforcement of accrued causes of action." *Id.* at 898-99.

The majority's analysis–essentially based on the maxim *expressio unius est exclusio alterius*–proceeds under the assumption that if assignments are not mentioned in § 106 then they cannot be a part of the exclusive rights listed. But, this analysis collides head on with the fact that the common law of assignments is law and, as Judge Bea correctly notes, law trumps canons of statutory interpretation. As the Supreme Court has held, statutes that invade the common

6

law must be read with a presumption favoring the retention of longstanding principles of common law "except when a statutory purpose to the contrary is evident" from the text of the statute. *See, e.g.*, *United States v. Texas*, 507 U.S. 529, 535 (1993) (collecting cases). Specifically, the Supreme Court stated that, "to abrogate a common law principle, the statute must 'speak directly' to the question addressed by the common law." *Id.* at 534; *see also, e.g.*, *United States v. Federative Republic of Brazil*, 748 F.3d 86, 95-96 (2d Cir. 2014) (same); *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 127-28 (2d Cir. 2001) (same). The majority's analysis inverts this principle. There is no question that the 1976 Act did not "speak directly" to the common law of assignment and no intention to repeal that longstanding principle of law is anywhere "evident." In light of these conspicuous omissions, *expressio unius* cannot be enlisted to override otherwise applicable common law.

Further, as Judge Bea noted, Congress unquestionably knows how to bar assignments of claims when that is its intention. *Silvers*, 402 F.3d at 900 (citing the Federal Anti-Assignment Act of 1862, 41 U.S.C. § 15; the Federal Assignment of Claims Act of 1940, 31 U.S.C. 3727; and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1056). It is hardly surprising to us

7

that nothing in the 1976 Act bars the assignment of the right to sue  because a central purpose of the 1976 modifications was to expand the ability to bring suits for infringement.

Moreover, it is far from clear to us that § 501(b) is even reasonably susceptible to the majority's interpretation.  Under that section, an owner of a right under a copyright is "entitled" "to institute an action for any infringement of that particular right committed while he or she is the owner of it."  17 U.S.C. § 501(b).  The majority concludes that "the most natural reading of this provision . . . is that by identifying who may bring suit under the Act, Congress signaled that others may not," Op. at 14.  And, the majority says that application of the *expressio unius* canon to the list of six "exclusive rights under a copyright" set out in § 106, which does not include the right to sue, means that Congress did not intend to permit suits by assignees of the right to sue for infringement.

The text does not support this reading.  First, § 501(b) provides that owners of an exclusive right under a copyright are "entitled" to bring an infringement action.  To entitle a party to do something is to grant that party a legal right.  But an "entitlement" does not limit the set of plaintiffs who may sue.  Because A is entitled to sue does not, after all, mean that B is not entitled to sue.  More,

8

importantly, as we have seen, to serve as the vehicle for overruling common law, the relevant provision–§ 501 (b)–must "speak directly" to Congress's intention to do so and that intention must be "evident," *Texas*, 507 U.S. at 535. Section 501 does not address the common law of assignment at all, much less directly, and no intention on the part of Congress to repeal the common law of permitting the assignability of claims is "evident."

Second, the majority reads § 501(b)'s language "to institute an action for any infringement of that particular right committed while he or she is the owner of it" to limit actions for infringement to owners of the rights when the infringement was committed. According to the majority, "section 501(b) prevents even holders of one of the exclusive section 106 rights from suing unless the alleged infringement occurred 'while he or she [was] the owner of it.'" Op. at 15 (quoting § 501(b)).

This reading cannot be reconciled with our Court's decision in *ABKCO*, which held that the owner of rights under a copyright can sell the rights and, at the same time, sell claims for infringement that had accrued when the (now former) owner possessed the rights. *ABKCO*, 944 F.2d at 980. The majority's reading of § 501(b) would preclude such a transaction, because the subsequent

9

owner would then be permitted to sue for infringement that occurred when he or she was *not* the owner of the copyright. But, where the majority extracts a charter for such a carve-out is elusive. The text does not reveal, and the majority does not proffer, any explanation for why a *former* copyright owner who transferred ownership but not claims is entitled under § 501(b) to institute an infringement suit. And, neither the text, nor the majority, explain why the *subsequent* owner, if he or she is transferred the accrued claim even with ownership rights, may institute an infringement action for infringement that was committed *before* he or she became the owner of the rights.

The majority contends that § 106 defines a closed set of the exclusive rights under a copyright such that the list's silence on whether the right to sue for copyright infringement is a separate right under a copyright means it meant to eliminate such a right. As the majority acknowledges, the legislative history of § 106 was intended to create a "bundle of rights" that "may be subdivided indefinitely." *See* Op. at 17 (quoting H.R. Rep. No. 94-1476, at 61). But, the Congressional Report on § 106 goes on to state that, when subject to a whole or partial transfer under § 201, "each subdivision of an exclusive right may be owned and enforced separately." H.R. Rep. No. 94-1476, at 61. The separate

10

enforcement of subdivided rights, such as when a former owner decouples an accrued infringement actions from a sale of copyright rights, is a strong indication that a rights holder can assign enforcement rights to others.

The majority goes on to distinguish copyright from numerous other federal rights for which assignability is permitted, essentially by asserting that copyright is different. *See* Op. at 18 ("[W]hether any trend toward assignability should apply in the copyright context is a different matter. Even assuming that congressional silence may, in general, reflect an intention not to preclude suit on assigned claims, we do not think it follows that such an interpretive principle would govern copyright claims.").

We all readily accept the proposition that a copyright may be "different." However, the majority never explains what those differences are and, more importantly, how whatever differences may exist require the excision of the assignment of claims from Congress's copyright scheme. Instead of identifying any specific characteristic of copyright that would make the assignment of copyright claims problematic, the majority generally claims that "the realm of intellectual property law has special characteristics that place it outside of any generally permissive regime for the assignment of federal claims." Op. at 22. But

11

this "generally permissive regime" cannot be dismissed offhandedly because, as we have seen, it is law–common law–and this Court is obligated to follow that law when, as here, the statute does not "speak directly" to the issue of assignability.

The majority's main support for its contention that the common law right to assignability of claims does not extend to copyright law is the Supreme Court's decision *in Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 40 (1923), which was not even a copyright case. This difference is important because while patent and copyright law are related, the Supreme Court has emphasized that caution must be exercised in applying doctrine formulated in one area to the other because major differences exist. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S 417, 439 n.19 (1984); *see also Mazer v. Stein*, 347 U.S. 201, 217 (1954) (declining to apply patent law to copyright law due to differences in the two bodies of law, as, for example, "[u]nlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea–not the idea itself").

Suffice it to say, the world of intellectual property has turned over many times since *Crown Die* was written nearly a hundred years ago by Chief Justice

Taft. There, the Supreme Court held that an accrued cause of action for patent infringement was not assignable under the 1874 Patent Act. Chief Justice Taft reasoned that the common law doctrine of assignment of a cause of action does not apply to patent law because patent law is a creation of Congress and "no rights can be acquired in it unless authorized by statute, and in the manner the statute prescribes." *Crown Die*, 261 U.S. at 40 (quoting *Gayler v. Wilder*, 51 U.S. 477, 494 (1850) (referring to patent rights)). He further reasoned that there was no legislative intent to permit splitting a patent claim from the underlying right because to do so would result in an aftermarket in patent claims because there was no indication that Congress intended to permit patent holders to create "several monopolies to be made out of one" because such subdivision would facilitate fraud against users of the patented device. *Id.* at 38.

In my view, *Crown Die* has little relevance to this appeal for a number of reasons. *See Silvers*, 402 F.3d at 903–05. First, it cannot be seriously disputed that Chief Justice Taft's view, formed from the single example of patent law, that in the absence of express Congressional authorization, pre-existing common law does not carry over into comprehensive statutory regulatory schemes is both directly contrary to modern Supreme Court doctrine that recognizes the vitality

13

of the common law in modern statutory schemes and is in significant tension with prior Supreme Court precedent governing the assignability of claims, *see Welch*, 14 U.S. (1 Wheat.) at 236.

*Sprint Communications* addressed this precise point and came out the other way, enabling claims under the Federal Communications Act to be assigned in the absence of express statutory authorization. *Sprint*, 554 U.S. at 285-86. And, as discussed above, *see supra*, 4-5, common law rights remain in force unless Congress speaks directly to the question addressed by the common law.

Second, as Judge Bea noted, *Crown Die* painstakingly explained why Congress would have disfavored claim assignments in the 1874 given the prevailing views of the functioning of the intellectual property marketplace. *See Silvers*, 402 F.3d at 904–05 (explaining that the 1874 Congress that passed the Patent Law, in contrast to the 1976 Congress that passed the Copyright Act, feared "several monopolies to be made out of one, and divided among different persons within the same limits"). Judge Bea also noted that concerns about the possibilities of fraud resulting from multiple assignments do not arise in the copyright context. The threat of such suits is addressed in both the 1909 and the

14

1976 Acts by the fact that suits for infringement are not permitted unless the registration provisions of the Acts had been complied with.

Third, the concern expressed in *Crown Die*–that assignments would generate a multiplicity of suits because of the existence of several owners of copyright uses–has been expressly overcome by allowing suit by the owner of "an" exclusive § 501(b) right to bring suit. Rather than supply any especially useful analogies to modern copyright law, *Crown Die*, in my view, highlights the many fundamental differences that exist between copyright and nineteenth century patent law–differences that make comparisons entirely problematic.

In sum, the key inquiry is not whether copyright and patent share a legal kinship, for of course they do, but whether their similarities extend to the matter germane here—whether the assignment of claims impacts both in the same way, a question the majority does not address. This omission is telling because the assignment of patent claims raises significant issues that do not arise when copyright claims are assigned. As a leading commentator has noted, "The fact that patent cases almost invariably entail judicial determination of validity argues for the presence in court of the patent owner in a way that copyright does not." 3 Paul Goldstein, *Goldstein on Copyright* § 15.5, at 15:42.2; *see also id.* (noting

that the *Silvers* decision "rests on a reading of the 1976 Act's standing provision–that in giving standing to copyright owners to institute actions for infringement, section 501(b) intended to exclude those to whom the owners may have chosen, for good reason or ill, to assign their cause of action–that is supported neither by the noncommittal legislative history, nor by the cited policy to protect good faith transferees").  The majority acknowledges that there is "equitable merit in allowing stock photography companies like DRK to aggregate copyright infringement claims otherwise accrued to their clients.  Aggregation could provide a practical means of forestalling and compensating for repeated small infringements and Congress might reasonably have chosen to permit such aggregation by assignment.  But, as drafted, the Copyright Act does not, in our reading, permit DRK to assert those claims. . . ."  Op. at 32.

Tellingly, the Supreme Court reached the opposite conclusion in *Sprint* even though the statute contained no express authorization of assignability. Payphone operators could assign their claims "[b]ecause litigation is expensive, because the evidentiary demands of a single suit are often great, and because the resulting monetary recovery is often small," *Sprint*, 554 U.S. at 271.  In light of these substantial benefits that even the majority acknowledges, it is puzzling that

16

it offers not one reason why the 1976 Congress would have disfavored assignment of claims. As Goldstein observed, "under what appears to be the majority view–and in any event the better view–an assignee who holds an accrued claim for copyright infringement, but has neither a legal nor beneficial interest in the copyright itself, may institute an action for infringement." *Id.* at 15:42-15:42.1.

Because I conclude that nothing in the Copyright Act precludes DRK from prosecuting claims on its non-exclusive licenses as an assignee of a bare right to sue, I would reverse on this ground alone and would not reach the question of whether DRK had beneficial ownership of a copyright interest.

Nor would I reach the question of the applicability of Arizona law to the Assignment Agreements. The majority, after an extended discussion, concludes that under Arizona law, DRK does not have a legal ownership interest sufficient to assert a cause of action for infringement. Op. at 29-30. I do not believe that the record permits us to resolve this issue with any confidence. The Agreements have no choice of law provisions and the issues of what law applies and what its relevant provisions are were never briefed. The majority's conclusions about the factual circumstances surrounding the execution of the Agreements, while

17

plausible, are purely conjectural because there is nothing in the record to support them.  Even if Arizona law does apply, I believe it is highly doubtful that the extrinsic evidence the majority relies on would be admissible.  *Taylor v. State Farm Mutual Auto Insurance Co.*, 854 P.2d 1134 (Ariz. 1993), which appears to be the leading case, is decisive.  It stands for the proposition that extrinsic evidence may not be used to "contradict or vary the meaning of the agreement."  *Id.* at 1141.  Other Arizona Supreme Court cases indicate that ambiguity in the language of a contract is required to admit extrinsic evidence.  *See Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 132 P.3d 825, 828 (Ariz. 2006) ("Under Arizona's parol evidence rule, where an ambiguity exists on the face of a document or the language admits of differing interpretations, parol evidence is admissible to clarify and explain the document." (internal alterations and quotation marks omitted)); *In re Marriage of Zale*, 972 P.2d 230, 232 (Ariz. 1999) ("[A]mbiguity is the prerequisite to the admission of extrinsic or parol evidence."); *Abrams v. Horizon Corp.*, 669 P.2d 51, 57 (Ariz. 1983) ("Where the contract is ambiguous, it is appropriate to look to parol evidence to resolve the ambiguity.").

Here, the critical provision of the Assignment Agreements states that "[t]he undersigned photographer . . . hereby grants to DRK all copyrights and

18

complete legal title in the Images." J.A. 411. By any reasonable calculus this statement is unambiguous. Wiley is using extrinsic evidence to extract another meaning from this provision by urging us to conclude that the photographers granted DRK something other than complete legal title. This approach is barred under Arizona law.

For these reasons, I respectfully dissent.